UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHAUNA EDWARD HARRIS,

    Plaintiff

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

_____/

Civil Action No. 16-13654

HON. R. STEVEN WHALEN
U.S. Magistrate Judge

## **OPINION AND ORDER**

Plaintiff Chauna Edward Harris ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. For the reasons discussed below, Defendant's Motion for Summary Judgment [Docket #26] is GRANTED and Plaintiff's Motion for Summary Judgment [Docket #21] is DENIED.

## **I. PROCEDURAL HISTORY**

On July 15, and August 14, 2014 respectively, Plaintiff filed applications for DIB and SSI, alleging disability as early as September 10, 2007 (Tr. 231, 233). After the initial denial of the claim, Plaintiff requested an administrative hearing, held on June 19, 2015 before Administrative Law Judge ("ALJ") Carol Guyton (Tr. 35). Plaintiff, represented by attorney Adam Banton, testified (Tr. 46-64), as did Vocational Expert ("VE") Don K. Harrison (Tr. 64-69). On August 26, 2015, ALJ Guyton determined that Plaintiff was capable of his past relevant work as a kitchen worker and alternatively, a significant range of other work (Tr.

27-29). On August 16, 2016, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision in this Court on October 13, 2016.

## II. BACKGROUND FACTS

Plaintiff, born June 12, 1985, was 30 when ALJ Guyton issued her decision (Tr. 29, 231). He completed a GED in 2000 and worked as a baker, cook, and manager (Tr. 299). He alleges disability resulting from a seizure disorder and depression (Tr. 298).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

He was disabled as of August, 2012 (Tr. 46). He stood 6' 1" and weighed 185 pounds (Tr. 47). He was divorced and had seven children by his former wife (Tr. 47). The last time any of his children lived with him was 2013 (Tr. 48). He currently lived in an apartment with a woman who took care of him; although she was a "good friend," they did not have a romantic relationship (Tr. 48). The friend was able to care for him during his seizures because she was "in the medical field" (Tr. 49). He had not worked since 2007 or 2008 and had never held a driver's license (Tr. 49-50).

Internal Revenue Service ("IRS") records stating that Plaintiff made $9,000 in 2014 were erroneously attributed to him and he was currently attempting to rectify the mistake with IRS (Tr. 50-51). Records showing that he made $300 in 2013 reflected an unsuccessful work attempt which ended when he had a seizure at work (Tr. 52). His former work as a cook and kitchen worker did not require him to lift more than 20 pounds (Tr. 55). Plaintiff was unable to work due to seizures occurring any time one to three times a week (Tr. 55). His seizures lasted no longer than 12 minutes but he experienced head and body aches for the next three to four days (Tr. 56). He took anti-seizure medication which had recently been increased (Tr. 56-57). He also took Norco and Mirtazapine (Tr. 57). He did not experience

a notable improvement in muscle pain with medication and did not experience medication side effects (Tr. 57). Prior to his latest emergency room visit, he had been hospitalized for two weeks earlier in the month (Tr. 58-59). He had not used alcohol since 2007 or used marijuana in the past two years (Tr. 60). He then acknowledged September, 2014 hospital records stating that he was then using alcohol and marijuana, noting that the use was due to "maybe a relapse" (Tr. 60).

Plaintiff did not perform any chores at home other than easy meal preparation (Tr. 61). He spent the day watching television and going to doctors' appointments (Tr. 61). He was unable to sit for even an hour due to back pain (Tr. 62). He was unable to stand or walk for more than 30 minutes or lift more than 20 pounds (Tr. 63). He denied manipulative limitations (Tr. 63). In response to questioning by his attorney, Plaintiff reported that after a seizure, he spent most of the day in bed (Tr. 63-64).

### B. Medical Evidence

#### 1. Records Related to Plaintiff's Treatment

June, 2012 emergency records state that Plaintiff experienced a seizure after failing to take his anti-seizure medication for three days (Tr. 374). November, 2012 emergency records state that Plaintiff experienced a seizure three days after he stopped taking his seizure medication (Tr. 377). January, 2013 emergency records state that Plaintiff requested anti-seizure medication (Tr. 381). He was given a prescription and "a list of free clinics in the area" (Tr. 381). In March, 2013, blood tests showed a "sub-therapeutic" level of Dilantin (Tr. 547). In May, 2013, Plaintiff experienced a seizure after failing to take his medication for at least three days (Tr. 518). He admitted to occasional alcohol use (Tr. 519). Plaintiff sought anti-seizure medication from emergency room personnel in July, 2013 (Tr. 384).

September, 2013 emergency room records note Plaintiff's report of seizures after

failing to take Dilantin for several days (Tr. 338). Plaintiff admitted to tobacco and marijuana use but denied using alcohol (Tr. 339). In November, 2013, Plaintiff sought emergency treatment for a seizure (Tr. 312). He reported to emergency room personnel that while he was compliant with the anti seizure medication, he had been drinking alcohol two days before the seizure and was smoking marijuana with his friends at the time of seizure (Tr. 312). He was diagnosed with alcohol withdrawal, drug abuse, electrolyte abnormality, head injury, hypoglycemia, and medical non-compliance (Tr. 313). A CT of the head was unremarkable (Tr. 313, 323-324). Plaintiff also reported left shoulder pain (Tr. 322). He was discharged under the care of his girlfriend (Tr. 313). He was advised to refrain from smoking marijuana because it could lower his "seizure threshold and was told not to drink alcohol which WILL lower [his] threshold" (Tr. 320)(capitalization in original). Emergency notes from later the same month also note that he was not compliant with medical advice (Tr. 335). A CT of the head was unremarkable (Tr. 347). In December, 2013, Plaintiff reported seizure activity after using alcohol during a trip out of town (Tr. 332).

In January, 2014, Ernest A. Mullen, M.D. noted Plaintiff's report of breakthrough seizures and that Plaintiff was "not adequately medicated" due to financial constraints (Tr. 351). He noted diagnoses of epilepsy and depression (Tr. 352). The following month, Plaintiff reported being compliant with his medication but admitted to regular alcohol use (Tr. 349). In May, 2014, Plaintiff reported a seizure while on a subway platform (Tr. 354). Plaintiff admitted that he had been non-compliant with Keppra and that "every time" he failed to take the anti-seizure medication for three days, he experienced a seizure (Tr. 361). The following month, imaging studies of the left shoulder were unremarkable (Tr. 391, 396). Plaintiff admitted that he had a seizure after failing to take his anti-seizure medication (Tr 393). In September, 2014, Plaintiff reported a seizure after drinking "a small amount of

alcohol" and using marijuana and cocaine (Tr. 406, 496, 503). He denied depressive symptoms (Tr. 496).

Treating records from later the same month state that Plaintiff had seven children by his former wife and two other children by two different women but was not in contact with any of them (Tr. 409). Plaintiff reported anxiety and depression but denied feelings of guilt (Tr. 409). He retracted his previous admission that he was drinking and using cocaine at the time of his recent seizure, attributing his confession to "residual from the seizure" (Tr. 417). He was referred to a neurologist for the condition of epilepsy (Tr. 412).

Mental health treating records by Theadia Carey, M.D. note Plaintiff's report of depression and sleep disturbances due to seizure activity (Tr. 441). Plaintiff denied using alcohol for the past six or seven years (Tr. 442). Plaintiff was diagnosed with a dysthymic disorder secondary to epileptic seizures (Tr. 446). He reported approximately one seizure each day (Tr. 625). In November, 2014, neurologist Lakshmi Shankar, M.D. noted that an MRI was negative for abnormalities (Tr. 427-428). The same month, Maura Bradley, M.D. noted Plaintiff's report of one to three seizures a day (Tr. 560).

In January, 2015, Plaintiff reported four seizures in 30 days while taking 500mg of Keppra as directed (Tr. 530). However, he demonstrated normal neurological and cognitive abilities (Tr. 531, 535). Imaging studies from the same month show a dislocation of the left shoulder (Tr. 537). Psychiatric treating records note that he was "depressed and stressed ever since" he was denied disability benefits (Tr. 620). In February, 2015, Plaintiff sought emergency treatment after experiencing a seizure (Tr. 449). He reported that he was medication compliant but noted that his dose of Keppra had been recently lowered by his neurologist (Tr. 449, 453). Dr. Shankar recommended that Plaintiff's Keppra dosage be restored to its previous level of 750mg (Tr. 460). A CT was unremarkable (Tr. 489, 576).

Treating records state that Plaintiff smelled strongly of alcohol (Tr. 476). Plaintiff admitted that he had been out with friends until 4:00 a.m. the previous day (Tr. 579). Treating records from the next month state that Plaintiff's Keppra dosage had been upped to 750mg (Tr. 570). The same records state that Plaintiff would be "most likely" undergoing surgery for the left shoulder condition (Tr. 571). The same month, Plaintiff was advised to decrease the Keppra and start another anti-seizure medication (Tr. 591).

In June, 2015, Dr. Bradley completed an assessment of Plaintiff's work-related abilities, finding that as a result of depression, epilepsy, and left shoulder problems, Plaintiff would be off task at least 25 percent of the workday and be unable to perform even "low stress" jobs (Tr. 601-602). She found that Plaintiff could walk up to four city blocks; sit or stand for more than two hours at a time; and stand/walk for around four hours in an eight-hour workday (Tr. 602-603). She found that Plaintiff was limited to lifting 20 pounds occasionally and 10 frequently (Tr. 603). She found that he was limited to occasional twisting and stooping but precluded from all climbing of ladders and stairs (Tr. 604). She precluded Plaintiff from all overhead activity with the left upper extremity (Tr. 604). She found that Plaintiff would be expected to miss more than four days of work each month (Tr. 604). Dr. Bradley's treating notes from the following day state that Plaintiff had recently been incarcerated for 72 days for driving with a suspended license (Tr. 606). Plaintiff did not display any abnormalities beyond a history of epilepsy and left shoulder pain (Tr. 609).

The following week, Plaintiff reported a seizure despite his report that he was fully medication-compliant (Tr. 634). The same month, Plaintiff reported that he wanted to resume psychiatric treatment, alleging that since his incarceration, he experienced depression, bipolar disorder, and schizophrenia (Tr. 612). Plaintiff appeared well groomed and dressed with good expressive and "receptive language skills" (Tr. 613).

## 2. Non-Treating Sources

In December, 2014, R. Sil, M.D. performed a consultative neurological examination on behalf of the SSA, noting Plaintiff's report of seizures three to four times a week followed by fatigue and the need to sleep (Tr. 430). Plaintiff denied smoking or drinking (Tr. 430). He demonstrated 5/5 motor strength and no neurological deficiencies (Tr. 431-433). The same day, Nick Boneff, Ph.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of anxiety and difficulty getting along with others (Tr. 435). Plaintiff reported that he had no friends and did not feel like getting out of bed most days (Tr. 436). Dr. Boneff found that Plaintiff was not capable of managing his benefit funds but "should be able to remember and execute a three or possibly four step repetitive procedure with little to no independent judgment or decision making required" (Tr. 438).

In January, 2015, Milagros Flores, M.D. performed a non-examining review of Plaintiff's treating records on behalf of the SSA, concluding that Plaintiff could lift 50 pounds occasionally and 25 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 126). He found that Plaintiff could balance, stoop, kneel, crouch, crawl and climb stairs frequently but was precluded from all climbing of ramps, ladders, or scaffolds (Tr. 126). He found that Plaintiff should avoid concentrated exposure to temperature extremes, wetness, humidity, noise, airborne hazards, and hazards such as machinery or heights (Tr. 127). The same month, James Tripp, Ed.D. performed a non-examining psychological evaluation on behalf of the SSA, finding moderate limitation in the ability to understand, remember, and carry out detailed instructions; interact appropriately with the public; and respond appropriately to workplace changes (Tr. 130-132, 135). Dr. Tripp found that as a result of affective, personality, and substance addiction disorders, Plaintiff experienced mild limitation in activities of daily living and social

functioning and moderate limitation in maintaining concentration, persistence, or pace (Tr. 147).

    **C. Vocational Expert Testimony**

VE Harrison classified Plaintiff's former work as a kitchen worker as exertionally medium and unskilled (light as performed)[1] (Tr. 65). The ALJ then posed a set of restrictions to the VE, describing a hypothetical individual of Plaintiff's age, education, and work background:

> [L]ight work, which means that they can frequently climb ramps and stairs, and balance and crawl and kneel and stoop and crouch, except that they cannot climb ladders, ropes or scaffolding or be exposed to hazardous machinery and unprotected heights. Now they are limited to unskilled work, which is no more than simple, short instructions, and simple work related decisions with few workplace changes. There's to be no contact with the general public, no work with production quotas or production - - or production pass. And . . . . a limitation for the [left shoulder. . . . [O]ccasional overhead reaching with the left upper extremity. And so with those limitations, can this person do their past relevant work? (Tr. 65-66).

The VE stated that the need to be off task at least 15 percent of the workday or, take four or more absences a month would preclude all competitive work (Tr. 67). He stated that his testimony was consistent with the *Dictionary of Occupational Titles* ("*DOT*") except for the testimony regarding time off task and workday absences, which was based on his own professional experience (Tr. 67). He stated further that the hypothetical limitations would allow for the light, unskilled work of a small products assembler (150,000 in the national

---

[1] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work " lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

economy); packer (35,000); and office cleaner (250,000) (Tr. 68).

### D. The ALJ's Decision

Citing the medical transcript, ALJ Guyton found that Plaintiff experienced the severe impairments of "seizure disorder, left glenohumeral joint instability, and adjustment disorder with mixed anxiety and depressed mood" but that none of the conditions met or medically equaled an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 21-22). She found that the condition of lumbago did not cause more than "minimal" limitation (Tr. 22). She found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 22-23). The ALJ determined that Plaintiff retained the Residual Functional Capacity ("RFC") for light work with the following limitations:

> [F]requently balance, crawl, kneel, stoop, crouch, or climb ramps and stairs. He could never climb ladders, ropes, or scaffolds. He could perform occasional overhead reaching with the left upper extremity. He could never be exposed to hazardous machinery or unprotected heights. He would be limited to unskilled work, which would be no more than simple short instructions and simple work related decisions with few workplace changes. He could never have contact with the general public. He could never work with production quotas or production pace (Tr. 23).

Citing the VE's testimony, the ALJ found that Plaintiff could perform his past relevant work as a kitchen worker as well as the light, unskilled work of a small products assembler, packer, or office cleaner (Tr. 27-29, 67-68).

The ALJ discounted Plaintiff's allegations of disability, noting that he was non-compliant with his anti-seizure medication (Tr. 24). She cited June, 2015 treating records showing that while the seizure disorder was not controlled, Plaintiff exhibited intact motor strength, normal reflexes, a normal gait and normal coordination and speech (Tr. 25). She accorded only "partial weight" to Dr. Bradley's June, 2015 opinion, noting that while the

finding that Plaintiff could lift up to 20 pounds with limited postural activity was well supported, Dr. Bradley's finding that Plaintiff would be off-task 25 percent of the day and need for frequent absences was contradicted by the "normal neurological findings" by treating sources (Tr. 25).

### III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir.  1985).  Substantial evidence is more than a scintilla but less than a preponderance.   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and  "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.  1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

### A.  Medication Non-Compliance

Plaintiff's first argument concerns his long-term failure to take his anti-convulsant medication. *Plaintiff's Brief* at 15, *Docket #21,* Pg ID 707. Plaintiff argues that the ALJ neglected to take into account that his non-compliance was attributable to financial limitations. *Id.* at 15-18. He notes further that although he became medication compliant in November, 2014, he continued to experience seizures. *Id.* at 17-18.

Under SSR 96–7p, 1996 WL 374186, *7 (July 2, 1996), an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain the "failure to seek medical treatment."[2] *See also* SSR 82–59, 1982 WL 31384, *4 (1982)(The ALJ must

---

[2]While SSR 96-7p was superseded by SSR 16-3p, SSR 96-7p applies to the current decision, issued in 2015.

consider an individual's claim that she is unable to afford the prescribed treatment).

Plaintiff's argument is a red herring. While the ALJ did not address the possible role that monetary limitations may have played in Plaintiff's non-compliance, the records do not overwhelmingly support that conclusion that his access to anti-seizure medication was attributable to financial constraints. As early as January, 2013, emergency room personnel provided him with a list of free medical clinics in his area (381). Records from January, 2014 forward indicate that he had access to regular medical care (Tr. 351). Despite the availability of medical care from that point forward, he continued his previously established pattern of experiencing a seizure after running out of medicine for three or four days then seeking emergency treatment.

Moreover, the records support the conclusion that Plaintiff's continued seizure activity was precipitated by his failure to follow medical advice, rather than financial constraints. Plaintiff acknowledged in February, 2014 that he used alcohol regularly (Tr. 349). February, 2014 treating records show that while Plaintiff was purportedly compliant with anti-seizure medication, he continued to use alcohol despite being previously advised that alcohol would precipitate seizure activity (Tr. 349). Records from the remainder of 2014 indicate that while he had access to medication, he failed to procure regular refills of the prescribed medication, and/or, used alcohol, marijuana, or cocaine (Tr. 349, 354, 361, 393, 406, 496, 503), despite being told as early as November, 2013 that the use of alcohol and marijuana would lower his seizure threshold (Tr. 320). While Plaintiff argues that he continued to experience seizures after becoming medication compliant in late 2014, late February, 2015 records show that he experienced a seizure after ingesting alcohol (Tr. 476). Although in June, 2015, Plaintiff reported one seizure despite his insistence that he was medically compliant, the records generously support the conclusion that the continued

seizure activity was attributable to either the failure to take the anti-seizure medical or continued substance abuse. The ALJ did not err in concluding that Plaintiff's non-compliance with medical advice stood at odds with the allegations of disability. *See Sias v. Secretary of HHS,* 861 F.2d 475, 480 (6th Cir.1988)(allegations of disability undermined by failure to follow the prescribed medical regime).

### B. Dr. Bradley's Treating Assessment

Plaintiff also contends that the ALJ erred by according only partial weight to Dr. Bradley's June, 2015 treating opinion. *Plaintiff's Brief* at 18-21. Plaintiff disputes the ALJ's rejection of Dr. Bradley's finding that he would be off task at least 25 percent of the day and absent from work more than four days a month due to seizure activity. *Id.*

Case law in effect at the time of Plaintiff's application requires that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009)(*internal quotation marks omitted*)(*citing Wilson v. CSS,* 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2)). In the presence of contradicting substantial evidence however, the ALJ may reject all or a portion of the treating source's findings, *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so. *Wilson,* at 547; 20 C.F.R. § 404.1527(c)(2); SSR 96–2p, 1996 WL 374188, *5 (1996). In explaining the reasons for giving less than controlling weight to the treating physician's opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) the "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson, at 544.*

The ALJ accorded "partial weight" to Dr. Bradley's June, 2015 findings, adopting the treating finding that Plaintiff was limited to exertionally light work and the preclusion on climbing of ladders, ropes, or scaffolds (Tr. 25 *citing* 601-604). In contrast, she rejected the finding that Plaintiff would miss more than four days a month and be off task for 25 percent or more of the workday, noting that Dr. Bradley's "limitations [were] excessive in light of the objective medical evidence, including the normal neurological findings exhibited . . . throughout treatment (Tr. 25).

Plaintiff, in effect, argues that while the neurological findings were essentially normal, the ALJ failed to take into account how the seizure activity and its aftermath would affect his ability to work. *Plaintiff's Brief* at 20. However, as discussed above, the ALJ permissibly found that the ongoing seizure activity was attributable to Plaintiff's non-compliance with medical advice (Tr. 24-25). *See* SSR 96–7p *supra,* at *8 ("individual's statements may be less credible" where "medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."). Aside from the ALJ's well-developed discussion of Plaintiff's non-compliance with medical advice, she noted that a December, 2014 neurological examination was wholly unremarkable (Tr. 430-433). Because the ALJ's partial rejection of Dr. Bradley's findings is well explained and well supported, a remand on this basis is not warranted.

### C. The RFC/Hypothetical Question

Finally, Plaintiff argues that the RFC for exertionally light, unskilled work did not take into account his significant limitation in concentrational limitations found by both Dr. Boneff and Dr. Tripp. *Plaintiff's Brief* at 21-24. He argues that hypothetical question to the VE and by extension, the identical RFC found in the administrative opinion does not reflect

his full degree of concentrational limitation.[3] *Id.*

It is well settled that vocational testimony given in response to a question that does include all of a claimant's relevant limitations does not constitute substantial evidence. *Varley v. Commissioner of HHS*, 820 F.2d 777, 779 (6th Cir. 1987); *Teverbaugh v. CSS*, 258 F.Supp.2d 702, 706 (E.D. Mich.2003) (Roberts, J)(reversible error for ALJ to rely upon unsupported job findings in making a Step Five determination).

In regard to Plaintiff's alleged concentrational limitations, the ALJ posed the following restrictions to the VE: "unskilled work, which is no more than simple, short instructions, and simple work related decisions with few workplace changes. . . . [N]o contact with the general public, no work with production quotas or production - - or production pass" (Tr. 65-66).

Plaintiff argues that in justifying the choice of hypothetical limitations, the ALJ mischaracterized Dr. Boneff's consultative findings. *Plaintiff's Brief* at 21. Plaintiff notes that the ALJ summarized Dr. Boneff's findings as follows: "demonstrated difficulties with concentration as evidenced by problems performing calculation tasks accurately but did display only strengths in immediate memory and the ability to pay attention" (Tr. 26).

---

[3] The ALJ ultimately determined at Step Four of the sequential analysis that Plaintiff could perform his past relevant work (Tr. 27). She was not required to use VE testimony in making the Step Four determination. *Studaway v. HHS*, 815 F.2d 1074, 1076 (6th Cir. 1987); *Mays v. Barnhart*, 78 Fed. Appx. 808, 813–814, 2003 WL 22430186, *4 (3rd Cir. October 27, 2003) ("At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ"). Although the use of a VE is optional in making a Step Four finding, "the propriety of the hypothetical question ... is a proper concern for the Court, since it may furnish relevant information that the ALJ may consider in determining whether the plaintiff could do her past work." *Merkel v. CSS*, 2008 WL 2951276, *4 (E.D. Mich. July 29, 2008) (Lawson, J.)(citing 20 C.F.R. § 404.1560(b)). Likewise here, the Court will address the adequacy of the limitations posed to the VE.

Plaintiff notes that Dr. Boneff actually found "difficulties with concentration as evidence[d] by problems performing calculation tasks accurately. He did display only *slight* strengths in immediate memory and the ability to pay attention [with] significant problems with short term memory as well." *Plaintiff's Brief* at 21-22 (emphasis in Brief)(*citing* Tr. 437-438).

The Court need not parse the difference between Dr. Boneff's finding of "slight strengths" in immediate memory and attention and the ALJ's "strengths in immediate memory and the ability to pay attention" given that Dr. Boneff ultimately concluded that Plaintiff's concentrational limitations did not preclude a significant range of unskilled work (Tr. 26, 437-438). While Dr. Boneff found some degree of concentrational limitation, he stated in conclusion that Plaintiff "should be able to remember and execute a three or possibly four step repetitive procedure with little to no independent judgment or decision making required" (Tr. 438). Dr. Boneff's findings cannot be interpreted to support the finding that Plaintiff experienced disabling concentrational limitations.

Likewise, Plaintiff's contention that the hypothetical limitations crafted by the ALJ did not adequately account for his deficiencies in concentration, persistence, and pace does not provide grounds for remand. Plaintiff relies on *Brown v. CSS,* 672 F.Supp 2d 794, 797 (E.D. Mich. 2009), which holds that remand is appropriate in the instance that the "ALJ's hypothetical question . . . with respect to concentration . . . does not reflect the frequency of the impairment" such as ability to "meet quotas, stay alert, or work at a consistent pace." *Id.* (*citing Edward v. Barnhard*, 383 F. Supp 2d 92, 930 (E.D. Mich. 2005)). However, *Brown* is distinguishable from this case. In contrast to *Brown* where the hypothetical restrictions were limited to "simple, routine, repetitive, one or two step tasks," *Id.* at 797, ALJ Guyton directly addressed Plaintiff's possible deficiencies in persistence in pace by precluding work with "production quotas or production . . . pass" (Tr. 65-66). Unlike *Brown,* the present

hypothetical question accounted for Plaintiff's limited ability to "meet quotas" and work consistently. The present hypothetical question further addressed Plaintiff's concentrational deficiencies by limiting him to (1) unskilled work (2) work with "no more than simple, short instructions," and, (3) "simple work related decisions with few workplace changes" (Tr. 65). Because these limitations adequately reflect the concentrational limitations found by both Dr. Boneff and Tripp, the RFC for a limited range of unskilled work does not provide grounds for remand.

Because the determination that Plaintiff was capable of performing his past relevant work as a kitchen worker and other unskilled light work was well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen, supra.*

## CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment [Docket #26] is GRANTED and Plaintiff's Motion for Summary Judgment [Docket #21] is DENIED.

IT IS SO ORDERED.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 23, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 23, 2018, electronically and/or by U.S. mail.

<pre>                              s/Carolyn M. Ciesla
                              Case Manager to the
                              Honorable R. Steven Whalen</pre>